Argued and submitted September 16, affirmed in part and reversed in part, October 30, reconsideration denied December 20, 1985, petition for review allowed March 4, 1986 (300 Or 562)
See later issue Oregon Reports

# ROACH,
### *Respondent - Cross-Appellant,*

*v.*

## MEAD, dba Berentson & Mead,
### *Defendant - Cross-Respondent,*

## BERENTSON, dba Berentson & Mead
### *Appellant - Cross-Respondent.*

## (A8303-01681; CA A32821)

709 P2d 246

Emil R. Berg, Portland, argued the cause for appellant - cross-respondent David J. Berentson. With him on the briefs was Hallmark, Griffith & Keating, Portland.

Stephen R. Frank, Portland, argued the cause for respondent - cross-appellant. On the brief were Paul R. Duden and Tooze, Marshall, Shenker, Holloway & Duden, Portland.

No appearance for appellant - cross-respondent Kenneth E. Mead.

Before Gillette, Presiding Judge, and Van Hoomissen and Young, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

In this legal malpractice case, defendant Berentson (defendant), a lawyer, appeals a judgment holding him vicariously liable for common law negligence and for a violation of the Unlawful Trade Practices Act (UTPA) by defendant Mead, his former law partner. Plaintiff cross-appeals the trial court's action in striking his claims under the Oregon Securities Law. We reverse as to the UTPA claim and otherwise affirm.

Defendant and Mead became partners in 1979 and were so at all relevant times. Each had previously practiced separately; plaintiff had been a client of Mead's. After the formation of the partnership, plaintiff continued to rely primarily on Mead for legal services, except that defendant completed his 1980 and 1981 tax returns. In June, 1980, plaintiff sold a business and asked Mead's advice on how to invest $20,000 of the proceeds. Mead ultimately suggested that plaintiff loan him the money, promising to pay interest at 15 percent a year and to repay the principal within two years. He claimed to have a large amount of money coming to him before that time. Some months later Mead borrowed another $1,500, claiming to be in temporary financial trouble but still expecting some big money. Mead never paid anything on either loan and was eventually discharged from them in bankruptcy proceedings.[1] Although Mead is a named defendant in this case, the only real issue is whether defendant is liable as a partner for Mead's actions.

Although defendant argues otherwise, plaintiff's negligence claim is based on Mead's failure to give plaintiff adequate legal advice. There is expert and other testimony from which the jury could have found that plaintiff relied on Mead for legal advice concerning the loan, that a lawyer seeking a loan from a client would be negligent if the lawyer did not tell the client to get independent legal advice and that a lawyer advising a client about this particular loan would seek to secure it and would warn the client of the risks involved in providing a usurious interest rate. The jury thus could have

---

[1] Mead resigned from the Oregon State Bar in early 1983 rather than contest a disciplinary proceeding arising from charges related to personal loans from clients. He was also convicted of theft by deception as a result of his actions concerning such a loan. 43 Or St Bar Bull No. 8, 42 (June, 1983).

found that Mead was negligent in his role as plaintiff's attorney.

■ Defendant offered to stipulate to Mead's negligence and assigns as error the admission of testimony describing and explaining that negligence. The testimony, defendant claims, smeared him with guilt by association with Mead and directed the jury's attention away from the primary issue, which was whether Mead acted in his capacity as a partner. The evidence was relevant. Defendant's primary defense was that the loan was a private business transaction between plaintiff and Mead and was not part of the business of the legal partnership. The challenged evidence tended to rebut that defense by showing that Mead was negligent *as a lawyer.* That Mead's negligence was in giving or failing to give legal advice was relevant to whether he acted within the scope of the partnership's business. The jury apparently understood the distinction; it awarded plaintiff damages for the $20,000 loan but not for the later $1,500 one, on which the evidence indicated that plaintiff did not seek Mead's advice.

■ Defendant also attacks the court's denial of his motion for directed verdict on the negligence claim. He argued to the trial court that the loans were simply personal transactions between plaintiff and Mead and were outside the scope of the partnership between defendant and Mead. However, as already noted, the evidence would support a finding that plaintiff relied on Mead for legal advice concerning the loan.[2] It would also support a finding that the giving of legal advice of this kind is within the business of a legal partnership and that this partnership did not limit its practice in a way which would exclude giving advice of the sort that Mead should have given. If so, the partnership and defendant, as the remaining partner, would be liable for Mead's negligence. ORS 68.250; ORS 68.270. The court did not err in its ruling concerning plaintiff's negligence claim.

■ Defendant's next assignment is that the court erred in denying his motion for a directed verdict on the UTPA claim. No Oregon case has considered whether an individual

---

[2] Mead offered plaintiff a second mortgage on his home to secure the $20,000 loan. Plaintiff told Mead to do whatever he thought was best, and Mead left the loan unsecured.

who loans money while intending to use the interest derived from the loan for personal, family or household purposes is within the protections of the UTPA for services received in making the loan.[3] We hold that the UTPA does not cover such service for a mere loan of money at interest, whatever the lender's intended use of the profits of the loan.

All portions of the UTPA which Mead arguably violated require that he acted with respect to or provided "real estate, goods or services." The UTPA defines that phrase as

"those which are or may be obtained primarily for personal, family or household purposes, and includes franchises, distributorships and other similar business opportunities, but does not include insurance. Real estate does not cover conduct covered by ORS 91.700 to 91.895." ORS 646.605(7).

Mead's actions could fit into this definition only if plaintiff loaned the money for "personal, family or household purposes." He would have done so only if he had intended to apply the profits to such uses. Plaintiff did not testify as to his intended use of the interest. However, even if he had testified that he had intended to use it for family purposes, and even if he had also told Mead of his intentions, we could not say that the loan fell within the statutory definition.

The basic problem with plaintiff's claim is that money is a medium, not an article, of commerce. We can say that a hay baler, purchased for use on a farm, or a truck purchased to haul freight were purchased for business rather than family use, even if the business was a family business. *See Searle v. Exley Express,* 278 Or 535, 564 P2d 1054 (1977); *Miller v. Hubbard-Wray,* 52 Or App 897, 630 P2d 880, *adhered to as modified,* 53 Or App 531, 633 P2d 1, *rev den* 292 Or 109 (1981). We can also say that a lawnmower, a television set or a gallon of paint was purchased for personal, family or household use. Money, however, is impossible to categorize. It may be used to purchase "real estate, goods or services" but it is not itself one of those things. If this loan were within the UTPA, so is every other source of money which plaintiff might use for

---

[3] We have held that the UTPA does not cover the business of lending money and that *borrowers* may not seek UTPA remedies for misleading statements by lenders. *Lamm v. Amfac Mortgage Corp.,* 44 Or App 203, 605 P2d 730 (1980). That issue is different from the question in this case, which is whether a *lender* may seek UTPA remedies for services the lender receives while making a loan.

family purposes, including his wages.[4] A person who simply loans money, with no other factors involved, cannot be within the protections of the UTPA.[5] The court erred in denying defendant's motion for directed verdict on the UTPA claim.

The jury specifically found both that Mead was negligent and that he violated the UTPA. These are two alternative bases for finding the same damages. The finding of negligence is sufficient in itself to support the damage award of $20,000. Thus, the only effect of reversing the UTPA verdict is to eliminate the legal basis for the court's award of attorney fees. That award will be stricken. Or Const, Art VII (Amended), section 3.

■      On cross-appeal, plaintiff attacks the court's grant of summary judgment on his claims under the Oregon Securities Law. For an investment to be a security under ORS 59.015(13)(a), and thus to come under that law, it must involve an investment of money in a common enterprise, with the profits to be made by the management and control of others. *Pratt v. Kross,* 276 Or 483, 497, 555 P2d 765 (1976). Plaintiff simply loaned Mead money. There was no common enterprise or sharing of profits. The court did not err.

On appeal, judgment for attorney fees stricken and otherwise affirmed; on cross-appeal, judgment affirmed.

---

[4] The specific inclusion of franchises in the definition of "real estate, goods or services," indicates a legislative recognition that income from any source intended for family use would otherwise be excluded from the UTPA.

[5] We do not consider the issue of a person who becomes the creditor of a financial institution by opening a checking or other account. Such accounts normally involve the purchase of various financial services for personal use, and the result may therefore be different.